**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | |
|---|---|
| **TRACY EARL SHELTON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )      **Case no.  1:15cv00044 PLC** |
| | ) |
| **NANCY A. BERRYHILL,**[1] | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM AND ORDER

Tracy Earl Shelton ("Plaintiff") seeks review of the Social Security Administration's

("SSA") decision denying his application for a period of disability and Disability Insurance

Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and his

application for Social Security Income ("SSI") under Title XVI of the Social Security Act, 42

U.S.C. §§ 1381 *et seq.*  The Court has reviewed the parties' briefs and the administrative record,

including the hearing transcript and the medical evidence.  Because the Court finds substantial

evidence supports the decision to deny benefits, the Court affirms the denial of Plaintiff's

applications.[2]

### I.  Background and Procedural History

---

[1]   Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.  No further action needs to be taken to continue this suit by reason of the last sentence of § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] The parties consented to the exercise of authority by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) [ECF No. 9].

In October 2011 Plaintiff applied for DIB and SSI. (Tr. 151-57 and <u>see</u> Tr. 14, respectively.) Plaintiff alleged he was disabled as of October 8, 2011,[3] due to hearing loss, sleep apnea, depression, right knee surgery, carpal tunnel surgery in both wrists, high blood pressure, "getting angry with people to[o] easily," loss of balance, "thyroid[, and] a goiter." (Tr. 252). The SSA denied Plaintiff's claims (Tr. 65-69), and Plaintiff filed a timely request for a hearing before an administrative law judge ("ALJ") (Tr. 72-73).

The SSA granted Plaintiff's request for review, and an ALJ conducted a hearing in November 2013. (<u>See</u>, <u>e.g.</u>, Tr. 74-96.) Plaintiff, who was represented by an attorney, testified that he was born in 1972, had graduated from high school, was married and lived at home with his wife and ten-year old son, and had last worked at a grocery store unloading trucks and stocking shelves on October 8, 2011. (Tr. 36-39.) His prior employment positions included working as a produce clerk at a grocery store, on an air conditioning unit assembly line, and as a machine operator molding wood for picture frames (Tr. 39-40.) Other than receiving two lump-sum worker's compensation payments due to a right knee injury and bilateral carpal tunnel syndrome, Plaintiff's only income was food stamps and energy assistance. (Tr. 37, 38.)

The medications Plaintiff takes are "mainly for pain, the high blood pressure[,] . . . the thyroid, [the] goiter, the depression, the high cholesterol, and [the diabetes]." (Tr. 42.) Plaintiff mentioned he had arthroscopic surgery on his right knee, carpal tunnel release surgery on both wrists in 2011, and, in 2005, a right ear cochlear implant; and he had complete deafness in his left ear. (Tr. 42-46.) Plaintiff complained of weakness and pain in his right knee and both wrists, hearing problems resulting from background noise, and throbbing pain and tenderness at the site of the implant. (Tr. 41-44, 47.) In regard to his right knee, Plaintiff described the pain as

---

[3] Plaintiff originally alleged that he was disabled as of March 13, 2010, but later amended the alleged date of onset. (Tr. 151, 235).

constant, with it "get[ting] worse when [he goes] out walking or tr[ies] to be a little physical," and when it remains bent. (Tr. 43, 48, 49-50, 55.) Plaintiff testified he "can't walk very far at all comfortably" and can only stand for "maybe 10 minutes" without changing positions. (Tr. 55.) On a scale of one to ten, Plaintiff characterized his "average daily" right knee pain as "get[ting] up as high as a ten sometimes." (Tr. 54.) To alleviate his knee pain, Plaintiff uses a "heating pad and l[ies] down," and takes two pain medications: Naproxen and Tramadol. (Tr. 43, 52.) Plaintiff stated, after having fallen twice, he uses a cane, which was not prescribed, "[p]retty often, mainly every time [he] go[es] out somewhere." (Tr. 43.) With respect to his wrists, Plaintiff testified that, after the bilateral carpal tunnel release surgeries, he "tend[s] more now to hav[e] like a pain . . . in [his] wrists." (Tr. 44.) Describing that daily pain, Plaintiff characterized it as a two on a scale of one to ten. (Tr. 53.) Plaintiff described his daily routine as driving his son to school in the morning, returning home and going to bed until noon, and then sitting in front of the computer, taking breaks because his "leg . . . bother[s him] if [he] sit[s] too long [and] bothers [him] if [he] stand[s] too long." (Tr. 50.)

A vocational expert ("VE") also testified at the administrative hearing. (Tr. 56-59.) The ALJ asked the VE to consider a hypothetical individual:

> who can perform a range of light work, lifting up to 20 pounds occasionally, lifting or carrying 10 pounds frequently, standing or walking for six hours and sitting for up to six hours per eight hour day with normal breaks, occasionally climbing ramps or stairs, never climbing ladders, ropes or scaffolds, occasional stooping but no kneeling, crouching or crawling, unable to tolerate exposure to noise above the moderate level [and] . . . , limited to occupations that do not require frequent verbal or telephone communication with all instructions delivered either by demonstration or face to face.

(Tr. 57.) The VE testified that all of Plaintiff's past work "would be eliminated," and there were other jobs in the regional or national economy that a person of Plaintiff's age, education and work experience could perform under the terms of the hypothetical: price marker, collator

operator, and garment sorter. (Tr. 57-58.) The VE affirmed that her testimony was consistent with the Dictionary of Occupational Titles ("DOT"), except as to the instruction limitation which she analyzed based on her professional opinion. (Tr. 59.) The ALJ also proposed two more hypotheticals, the second adding to the first hypothetical a requirement that the person elevate a leg above waist high "outside of the normal rest and lunch periods" and the third adding to the first hypothetical a requirement that "the person can sit and stand for 20 minutes and then has to change positions to the other exertional position before returning, again at 20 minute intervals." (Tr. 58-59.) In response to each of the second and third hypotheticals, the VE testified such limitations would eliminate all three of the jobs she had reported in response to the first hypothetical, as well as "all other work." (Id.) The VE stated her responses to the second and third hypotheticals were based on her professional opinion as to the elevating of feet and extra breaks and alternating positions, because those aspects of work are not included in the DOT. (Tr. 59.)

In denying Plaintiff's applications, the ALJ applied the five-step evaluation process set forth in 20 C.F.R. §§ 404.1520 and 416.920;[4] found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2016; and concluded Plaintiff had not engaged in substantial gainful activity during the period from his alleged onset date of October 8, 2011, through the date of the decision, December 12, 2013. (Tr. 14-24). The ALJ also determined Plaintiff had the severe impairments of degenerative joint disease of the right

---

[4] A claimant is eligible for disability or SSI benefits if the claimant demonstrates he or she suffers from a medically determinable physical or mental impairment that renders claimant unable to engage in substantial gainful activity and can be expected either to result in death or to last twelve months. 42 U.S.C. §§ 423(a)(1), 423(d), 1382c(a)(1), 1382(a)(3). To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 404.1520 (for period of disability and disability benefits) and § 416.920 (for SSI). Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

knee, obesity, and hearing loss status post-2005 cochlear implant that significantly limit Plaintiff's ability to perform work activities. (Tr. 16.) Additionally, the ALJ found Plaintiff had the following non-severe impairments: coronary artery disease, carpal tunnel syndrome in his upper extremities, restless leg syndrome, diabetes, and depression. (Tr. 16-18.) Plaintiff did not, the ALJ further found, have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 19.)

After reviewing Plaintiff's testimony and medical records, the ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; [but Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 21.) The ALJ concluded that Plaintiff had the Residual Functional Capacity ("RFC")[5] to "perform less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b)" based on findings Plaintiff:

> can occasionally lift 20 pounds, frequently lift/carry 10 pounds, stand/walk for 6 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday with normal breaks[;] . . . can occasionally climb ramps or stairs, but can never climb ladders, ropes, or scaffolds[; and] . . . can occasionally stoop, but can never kneel, crouch, or crawl.

(Tr. 19.) Such light work, the ALJ found, was further limited to work that did not "require exposure to noise levels above the moderate level," did not "require frequent verbal or telephone communication," and delivered instructions "by demonstration or face to face." (Id.) The ALJ decided that Plaintiff was unable to perform any past relevant work, but there were other jobs in significant numbers in the national economy that Plaintiff could perform, in view of his age,

---

[5] The RFC is the most a person can do despite that person's limitations. See, e.g., 20 C.F.R. § 404.1545(a).

education, work experience, and RFC, including: "light exertional level, unskilled jobs," such as price marker, collator operator, and garment sorter. (Tr. 23.)

The ALJ held that Plaintiff was not "under a disability, as defined in the Social Security Act from October 8, 2011, through the date of [the ALJ's] decision (20 CFR 404.1520(g) and 416.920(g))," and was not disabled for purposes of either DIB or SSI. (Tr. 24.) Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review. (Tr. 7-9, 1-5, respectively). Plaintiff exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000). The SSA's final decision after a hearing is subject to judicial review. 42 U.S.C. § 405(g) (for DIB); 42 U.S.C. § 1382(c)(3) (for SSI).

## II. Standard of Review

A court must affirm the SSA's final decision if it is supported by substantial evidence on the record as a whole. Buford v. Colvin, 824 F.3d 793, 795 (8th Cir. 2016); 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the ALJ's determination." Buford, 824 F.3d at 795 (internal quotation marks omitted) (quoting Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005)). In deciding whether substantial evidence supports the Commissioner's final decision, a court must review the administrative record as a whole and consider the ALJ's credibility findings, vocational factors (education, background, work history, and age), the medical evidence from treating and consulting physicians, subjective complaints regarding exertional and non-exertional activities and impairments, any third-party corroboration of the impairments, and, when required, vocational expert testimony that is based on a proper hypothetical question setting forth the impairments. Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir.

1992). A court reviewing the Commissioner's final decision considers evidence that both supports and detracts from the decision. Buford, 824 F.3d at 795. However, a court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ"s determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (internal quotation marks omitted) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions" of the SSA. Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (internal quotation marks omitted) (quoting Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (internal quotation marks omitted) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)).

### III. Discussion

Plaintiff argues that substantial evidence does not support the ALJ's decision because the ALJ erred in: (1) finding Plaintiff's bi-lateral carpal tunnel syndrome and diabetes were not severe impairments, and (2) failing to develop the record regarding Plaintiff's upper extremities and knee pain. (ECF No. 16.) The Commissioner counters that: (1) Plaintiff failed to demonstrate that his bi-lateral carpal tunnel syndrome and his diabetes were severe; and (2) the ALJ did not need to further develop the record because Plaintiff failed to show the ALJ was incapable of making a decision regarding Plaintiff's bi-lateral carpal tunnel syndrome and right knee pain based on the information in the record.

A. Severity of Impairments – Bilateral Carpal Tunnel Syndrome and Diabetes

Plaintiff claims that competent and substantial evidence does not support the ALJ's conclusion that Plaintiff's bilateral carpal tunnel syndrome and diabetes are non-severe impairments. As to the former, Plaintiff contends the ALJ improperly relied on a February 2013 medical examination during which Plaintiff reported the issues with his hands were resolved and a related nerve conduction test that revealed "normal" handgrip, rather than on Plaintiff's testimony at the hearing that he continued to have daily hand pain.[6] With respect to the diabetes, Plaintiff argues the ALJ erred in classifying that condition as nonsevere because, Plaintiff asserts, Plaintiff credibly testified at the hearing that he stays "constantly drained of energy" and "takes naps during the day."[7] Defendant counters that the ALJ's severity analysis of these impairments is supported by the record showing improvement with treatment and the absence of a medical opinion that these impairments imposed greater limitations than those included in the ALJ's RFC finding. Defendant also urges Plaintiff is essentially asking the Court to reweigh the evidence and make a different finding, which the Court may not do.

At step two of the evaluation process, an ALJ must determine if a claimant suffers from a severe impairment. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007) (discussing disability and SSI benefits); see also 20 C.F.R. § 404.1520(a)(4)(ii) (disability benefits); § 416.920(a)(4)(ii) (SSI benefits). To demonstrate that an impairment is severe, a claimant must show that he or she has (1) a medically determinable physical or mental impairment, or combination of impairments, which (2) "significantly limits [his or her] physical or mental ability to do basic work

---

[6] Plaintiff also asserts his testimony at the hearing before the ALJ revealed that "he frequently drops things due to weakness in his hands." Pl. Br. at 3 [ECF No. 16]. A review of the transcript of the hearing before the ALJ, however, does not reveal any such testimony by Plaintiff.

[7] Plaintiff's position that he credibly testified his fatigue and sleepiness is due to his diabetes is not supported by the record of the hearing.

activities,"[8] without regard to age, education, or work experience. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 404.1521(a), 416.920(a)(4)(ii), 416.920(c), 416.921(a). An impairment "is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a), § 416.921(a). Put another way, an impairment is not severe if it "amounts only to a slight abnormality" that "would have no more than a minimal effect" on the claimant's ability to work. Kirby, 500 F.3d at 707 (citing Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007)). Although a claimant has "the burden of showing a severe impairment that significantly limited [his or her] physical or mental ability to perform basic work activities[,] . . . the burden of a claimant at this stage of the analysis is not great." Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001)). See also Kirby, 500 F.3d at 708 ("Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard").

In support of his argument that the ALJ improperly classified his bilateral carpal tunnel syndrome and his diabetes as nonsevere, Plaintiff cites Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2009). Brown affirmed the SSA's denial of disability benefits because (1) the treating physician's opinion on the plaintiff's disability was not entitled to controlling weight and (2) the ALJ properly discounted the plaintiff's subjective complaints of pain. Id. at 540-41 and 541-42, respectively. However, in Brown the Eighth Circuit did not address the severity of an impairment, other than to quote the regulatory definition of a severe impairment. Id. at 538 (quoting 20 C.F.R. § 404.1520(c)). Accordingly, it is inapplicable here.

1. Bilateral Carpal Tunnel Syndrome

---

[8] Basic work activities include, among other things, "(p)hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." 20 C.F.R. § 416.921(b).

Plaintiff contends substantial and competent evidence does not support the ALJ's finding that Plaintiff's bilateral carpal tunnel syndrome is a nonsevere impairment. Specifically, Plaintiff argues the ALJ improperly relied on a February 2013 nerve conduction study and should have instead focused on Plaintiff's subsequent testimony at the administrative hearing regarding his wrist pain.

At the administrative hearing, Plaintiff testified that he had carpal tunnel release surgery on both wrists in 2011. (Tr. 43-44.) He acknowledged the surgery "improved things. [He's] not waking up at night anymore with numbness," however, he reported, he "tend[s] more now to hav[e] like a pain . . . in [his] wrists." (Tr. 44.) Describing the daily pain in his wrists, Plaintiff characterized it as two on a scale of one to ten. (Tr. 53.) Plaintiff also stated he "is a little weak in [his] hands . . . not as strong in them as [he] used to be" and he "ha[d dropped things] before." (Tr. 41, 53.) Plaintiff reported that the doctor analyzing the most recent nerve conduction study said Plaintiff "still ha[s] . . . a slight case of carpal tunnel" on both sides. (Tr. 53.)

Plaintiff's medical records demonstrate that, before the relevant October 8, 2011 date of disability and after a nerve conduction study,[9] Richard Howard, D.O. concluded Plaintiff had "a moderate degree of sensory motor carpal tunnel syndrome bilaterally," and recommended "staged bilateral carpal tunnel release" surgery. (Tr. 598.) After this diagnosis, Dr. Howard performed the recommended surgery in March 2011. (Tr. 603, 604.) Post-surgery Plaintiff's physical symptoms improved.

After the date of disability, Chul Kim, MD, examined Plaintiff, on December 15, 2011, and stated that, since the bilateral carpal tunnel release surgery, Plaintiff reported "the numbness

---

[9] The February 24, 2011, nerve conduction study was performed by Daniel Phillips, M.D., who opined Plaintiff had "severe sensory motor median neuropathy across the right carpal tunnel with sensory axonal involvement [and] significant moderate predominantly demyelinative sensory motor median neuropathy across the left carpal tunnel." (Tr. 599-600.)

in [his] hands was resolved and [Plaintiff] has little pain in the palmar aspect of bilateral wrists." (Tr. 605.)  Dr. Kim reported Plaintiff's "[h]andgrip and fine finger movements were normal" and other than his right knee and right hip joints, "[a]ll other major joints were without significant . . . limitation of the range of motion."  (Tr. 608.)  Dr. Kim's assessment of Plaintiff included his impression that Plaintiff had a "[h]istory of bilateral carpal tunnel release [and] has some pain at wrists."  (Tr. 608.)

Plaintiff did not mention his carpal tunnel syndrome symptoms when he saw medical care providers in May, June, and September 2012.  (Tr. 624-634.)  On February 12, 2013, in an examination to establish medical care of Plaintiff, D. L. Davis, M.D., noted Plaintiff had had bilateral carpal tunnel surgery before and has "some mild left and right carpal tunnel issues of his upper extremities."  (Tr. 640-42.)  After a nerve conduction study, Dr. Davis "found left and right median (wrist to APB) DMLs outside normal limits [and] assessed mild left and right neuropathy at wrist; left ulnar nerve conduction within normal limits."  (Tr. 658.)  After this visit, Plaintiff did not see a medical care provider for carpal tunnel syndrome symptoms or mention such symptoms to a medical care provider, although he saw a physician on March 13th, April 11th, April 25th, June 17th, June 20th, June 21st, July 1st, July 18th, July 26th, August 15th, September 3rd, and September 30th of 2013.  (See Tr. 666, 669-72, 674-75, 677, 682,701-12, 713-16, 724-26, 727-31, 732-33, 736-37.)

The ALJ found the carpal tunnel syndrome in both upper extremities did not have more than a minimal impact on Plaintiff's ability to perform basic work activities, and was a nonsevere impairment.  (Tr. 17.)  In reaching this conclusion, the ALJ noted the post-surgery medical records available after October 8, 2011, showed only mild neuropathy in Plaintiff's wrists as of February 2013, and "'normal' handgrip and fine finger movements."  (Id.)  Additionally, the ALJ

referred to Plaintiff's reports to medical care providers that the numbness in his hands was resolved and that he had "little pain" since the carpal tunnel release surgery. (Tr. 17.)

Furthermore, in concluding that Plaintiff's RFC was in the light range with specified limitations, the ALJ expressly took into consideration Plaintiff's nonsevere impairments, Plaintiff's subjective complaints, all symptoms, and medical evidence. (Tr. 19-22.) When addressing Plaintiff's RFC, the ALJ gave no weight to opinions in Plaintiff's worker's compensation records limiting or restricting Plaintiff's work due to his carpal tunnel syndrome. (Tr. 22.) The ALJ reasoned that: (1) the opinions were rendered prior to October 8, 2011; (2) treatment providers subsequently determined Plaintiff "could return to work with no restrictions"; and (3) Plaintiff was engaged in substantial gainful activity after the surgeries and up until October 8, 2011. (Id.) In considering Plaintiff's RFC, the ALJ also gave only "some weight" to the opinion of the State agency medical consultant who "opined that [Plaintiff] can perform the full range of medium exertional level work."[10] (Id.) The ALJ characterized the medical consultant's opinion as:

> generally consistent with the fairly unremarkable medical evidence and the fact that [Plaintiff] was told he could return to work with no restrictions. However, taking [Plaintiff]'s subjective complaints into account to a greater extent, particularly the reports of ongoing knee pain, [the ALJ] limited [Plaintiff] to light exertional level work subject to various nonexertional limitations.

(Id.)

Upon review, the Court finds the ALJ properly evaluated Plaintiff's bilateral carpal tunnel syndrome as a nonsevere impairment. The evidence revealed, as the ALJ found, that Plaintiff reported to medical care providers examining him after October 8, 2011 that he had no

---

[10]  On December 27, 2011, Libbie Russo, M.D., a State agency medical consultant, completed a physical RFC assessment stating, in relevant part, that Plaintiff could occasionally lift or carry fifty pounds and frequently lift or carry twenty-five pounds; had unlimited push and pull capability, except for the lift or carry limitations; and had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 612-17.)

more than "little" or "some" pain in his wrists, and the most recent examination and nerve conduction study, in February 2013, resulted in a diagnosis of "mild" carpal tunnel syndrome. While Plaintiff mentioned at the hearing that he had daily pain in his hands, he rated that pain as low (a two on a scale of one to ten). This low pain complaint mirrored, rather than contradicted, the wrist pain reported in Plaintiff's medical records, on which the ALJ relied. Moreover, to the extent a State agency medical consultant assessed Plaintiff in December 2011 with the ability to perform a full range of medium exertional level work, the ALJ took Plaintiff's subjective complaints into account and reduced the level of work Plaintiff could perform to light exertional level work subject to various nonexertional limitations.

Additionally, Plaintiff's testimony regarding his wrist pain did not demonstrate that his low-rated pain adversely affected his daily activities. As he testified, Plaintiff drove a car and used a computer on a daily basis. Plaintiff did not refer to an increase in any wrist pain in association with those daily activities or as a reason for any limitation on those activities.

The record demonstrates that Plaintiff's bilateral carpal tunnel syndrome since October 8, 2011, including any pain associated with it, is no more than a "slight abnormality" having no more than a "minimal effect" on Plaintiff's ability to perform basic work activities. Substantial and competent evidence supports the ALJ's decision that Plaintiff's bilateral carpal tunnel syndrome did not significantly limit Plaintiff's physical ability to do basic work activities and, therefore, was not a severe impairment.

2. Diabetes

Plaintiff also contends substantial and competent evidence does not support the ALJ's finding that Plaintiff's diabetes is a nonsevere impairment. In particular, Plaintiff asserts that he "credibly testified" at the administrative hearing that he was "constantly drained of energy" and

took daily naps. At the administrative hearing, Plaintiff testified he takes Metformin for the diabetes, is trying to "do better" with his diet, checks his blood sugar regularly ("they run 115 to around 130"), and was seeing a nutritionist but missed the last appointment several months earlier. (Tr. 51-55.)

The medical records reveal that the initial diabetes diagnosis occurred as a result of a September 11, 2012, examination of Plaintiff by Travis Weiss, a physician's assistant. (Tr. 628-30.) They discussed nutrition, aerobic exercise, and avoiding soft drinks, simple sugars, and high calorie foods. (Id.) P.A. Weiss saw Plaintiff again two weeks later, and provided instructions about diet, exercise, and good foot hygiene. (Id.)

On February 12, 2013, Plaintiff discussed his diabetes with Dr. Davis. (Tr. 640-42.) Plaintiff reported to Dr. Davis that his sugars were "coming under better control, but still [were] not quite adequate." (Id.) Dr. Davis advised Plaintiff to consult with a diabetic educator, try to reduce his weight, and return in two to three weeks. (Id.) In 2013 Plaintiff saw Dr. Davis about diabetes on March 18th, April 11th, May 16th, August 15th and September 30th. (Tr. 682-83, 679-80, 674, 713-15, and 736-37.) At the April appointment, Plaintiff reported his sugars were "starting to run under better control," and Dr. Davis directed Plaintiff to continue his diet and to exercise to the extent he could tolerate it, and return in a month to check his A1c level. (Tr. 679-80.) Dr. Davis noted at the May appointment that Plaintiff's A1c was "down to 6.6," and continued Plaintiff on "his present regimen, [noting Plaintiff has] done a good job with this, [and Plaintiff reports the] diabetic educator is helping significantly." (Tr. 674.) In August, Dr. Davis

reported that Plaintiff's A1c was down to "6.3" and Plaintiff's blood sugars were doing well. (Tr. 713-15.)[11]

When assessing the severity of Plaintiff's diabetes, the ALJ stated "the record reflects that this condition is controlled with treatment and/or consistent monitoring."[12] (Tr. 17.) The ALJ's assessment of the control of Plaintiff's diabetes is supported by the record of Plaintiff's medical care in 2013. Furthermore, in reaching the decision that Plaintiff's RFC was in the light range with specified limitations, the ALJ expressly took into consideration Plaintiff's nonsevere impairments, Plaintiff's subjective complaints, all symptoms, and medical evidence. (Tr. 19-22.) The ALJ noted a State agency medical consultant had found Plaintiff's RFC at a higher, medium level of work but gave that opinion only "some weight" upon consideration of Plaintiff's subjective complaints. (Tr. 22.)

Upon review, the Court finds the ALJ properly evaluated Plaintiff's diabetes as a nonsevere impairment. The record, especially the reports of the beneficial effects the course of treatment and monitoring had on the diabetes, demonstrates that Plaintiff's diabetes is no more than a "slight abnormality" having no more than a "minimal effect" on Plaintiff's ability to perform basic work activities. Accord Renstrom, 680 F.3d at 1066 (conditions that are controlled by treatment are not disabling); Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009) ("[i]f an impairment can be controlled by treatment or medication, it cannot be considered disabling"). There is substantial and competent evidence supporting the ALJ's decision that

---

[11] At the September 30, 2013 appointment to address Plaintiff's diabetes and right knee pain, Dr. Davis reported he would see Plaintiff again after a sleep study. (Tr. 736-37.) No medical records are available for any medical care provided Plaintiff after September 30, 2013, or to demonstrate the results of any sleep study in 2013.

[12] The ALJ also mentioned as support for his severity analysis that Plaintiff had not listed his diabetes "on his Disability Report when asked to identify the conditions he believes keep him from working." (Tr. 17.) The Court does not find that omission significant because Plaintiff completed his Disability Report in October 2011 and his first diabetes diagnosis was made later, in September 2012. (Tr. 251-59; 628-30.)

Plaintiff's diabetes did not significantly limit Plaintiff's physical ability to perform basic work activities and, therefore, was not a severe impairment.

B. Development of Record – Upper Extremities and Knee Pain

Plaintiff contends the ALJ did not fulfill his duty to fully develop the record regarding his carpal tunnel syndrome and right knee pain, citing Eichelberger v. Barnhart, 390 F.3d 584, 592 (8th Cir. 2004), Snead v. Barnhart, 360 F.3d 834, 835 (8th Cir. 2004), and 20 CFR § 416.917. In particular, Plaintiff asserts the ALJ erred in failing "to have an examination done on [Plaintiff's] wrists and upper extremities to reconcile the discrepancies between the medical evaluation from February 2013 and [Plaintiff's] testimony" at the administrative hearing. (Pl.'s Br. at 4 [ECF No. 16]) With respect to the right knee pain, Plaintiff contends the ALJ erred in failing to develop the record regarding the condition and severity of injury to Plaintiff's right knee. (Id. at 6.)

Defendant responds that Plaintiff has not satisfied his "heavy burden" to demonstrate the record was inadequately developed and notes that the record reveals multiple x-rays and physical examinations of Plaintiff's right knee and wrists. Citing Tellez v. Barnhart, 403 F.3d 953, 956-57 (8th Cir. 2005), Defendant argues there is no "indication that the ALJ felt incapable of making a determination regarding" Plaintiff's carpal tunnel syndrome and right knee pain. (Def.'s Br. at 9 [ECF No. 19].)

An ALJ "has a duty to fully and fairly develop the evidentiary record." Byers v. Astrue, 687 F.3d 913, 915-16 (8th Cir. 2012). This duty may require an ALJ to obtain additional medical evidence before rendering a decision. See 20 C.F.R. § 404.1519a(b) (disability), § 416.1519a(b)(SSI). "The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether

the claimant is disabled." McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011); accord Buford, 824 F.3d at 797 (citing Martise v. Astrue, 641 F.3d 909, 926-27 (8th Cir. 2011)). If other evidence in the record provides a sufficient basis for an ALJ's decision, then an ALJ "is permitted to issue a decision without obtaining additional medical evidence." Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995) (internal quotation marks omitted) (quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994)). Importantly, an ALJ's duty to develop the record is not never-ending. McCoy, 648 F.3d at 612. The decision whether an ALJ has failed to develop the record is made on a case-by-case basis. Mouser v. Astrue, 545 F.3d 634, 639 (8th Cir. 2008).

The cases on which Plaintiff relies, Eichelberger and Snead, do not support a conclusion the ALJ failed fully to develop the record under the circumstances here. In Eichelberger, the Eighth Circuit noted an ALJ has "the duty to develop the record independent of the claimant's burden in the case." Eichelberger, 390 F.3d at 592. The burden of persuasion to prove disability and to demonstrate the RFC, however, "remains on the claimant." Id. Where "no crucial issue[s are] left undeveloped," a claimant does not satisfy his or her burden of persuasion. Id. The Eighth Circuit affirmed the ALJ's decision, in relevant part, because no crucial issues were undeveloped in the record. Id. Here, the Court concludes the record includes evidence addressing the crucial issues regarding Plaintiff's upper extremities and knee pain.

Likewise, Snead does not assist Plaintiff. In Snead, the Eighth Circuit remanded the case for further development of the record because the ALJ improperly rejected a medical opinion that the plaintiff was not able to work based on "congestive heart failure due to dilated cardiomyopathy." Snead, 360 F.3d at 839. The Eighth Circuit concluded the ALJ's decision to reject that opinion lacked support in the record because the record had "no clinical findings" that "would undermine" that opinion. Id. By contrast, here the medical and other evidence supports

the ALJ's decision, including his decision to reject or limit certain opinions regarding Plaintiff's upper extremities and right knee pain.

### 1.  Upper Extremities

Plaintiff asserts the ALJ erred in failing "to have an examination done on [Plaintiff's] wrists and upper extremities to reconcile the discrepancies between the medical evaluation from February 2013 and [Plaintiff's] testimony" at the administrative hearing.  (Pl.'s Br. at 4 [ECF No. 16])  In particular Plaintiff contends his testimony "differ[ed] so significantly from the evaluation performed in February 2013," that the ALJ had a duty to order another evaluation. (Id.)

Plaintiff urges his testimony differed significantly from the February 2013 evaluation because he "testified that he has 'major pain' in his hands and he frequently drops things during the day due to his hands being weak."  (Pl. Br. at 4 [ECF No. 16].  The transcript of the administrative hearing before the ALJ does not support Plaintiff's contention.  Rather, Plaintiff's testimony, including his evaluation of his daily wrist pain as two on a scale of one-to-ten, is not contrary to the February 2013 evaluation resulting in a finding that Plaintiff had mild carpal tunnel syndrome.  Because the purported discrepancy between Plaintiff's testimony and the February 2013 evaluation of his wrists is not significant, no crucial issue regarding Plaintiff's carpal tunnel syndrome was undeveloped.  Additionally, there is no indication the ALJ was unable to address Plaintiff's concerns about his upper extremities.  There is sufficient medical evidence in the record to support the disability determination with respect to Plaintiff's upper extremities.  Accordingly, the ALJ did not err in failing to further develop the record regarding Plaintiff's bilateral carpal tunnel syndrome.

### 2.  Right Knee Pain

Plaintiff urges the ALJ erred in failing to develop the record regarding his right knee pain, based on (1) his complaints of right knee pain during appointments with medical professionals, including reports that a knee brace and arthroscopic surgery did not help; (2) medical records, which Plaintiff characterizes as showing the knee pain was "getting significantly worse as time goes on," he had a diagnosis of a degenerative condition in his right knee, and he needed to have "unicompartmental knee replacement"; (3) his administrative hearing testimony that he continued to suffer knee pain that increased with walking and bending, and required lying down, use of a heating pad, pain medication, and a cane for relief; and (4) Dr. Davis's observation in September 2013[13] that Plaintiff had "significant right knee pain and crepitance."

During the administrative hearing, Plaintiff testified that he suffered a right knee injury during his grocery store work and had arthroscopic knee surgery. (Tr. 42.) Plaintiff stated that he "can't really squat," "can't walk very far at all comfortably," and needs to change positions about every ten minutes while standing. (Tr. 41, 55.) Additionally, Plaintiff reported "a lot of times [his] leg wants to give on [him]," so he has a cane, which was not prescribed, that he uses "[p]retty often, mainly every time [he] go[es] out." (Tr. 41, 43.)

Plaintiff also stated he has "pretty much constant" pain in his right knee, "mainly toward the inner side of [his] kneecap." (Tr. 42-43.) Plaintiff described the pain as "tend[ing] to get worse when [he's] out walking or trying to be a little physical." (Tr. 43, 54.) Bending the right knee causes the pain to increase, Plaintiff noted, as does standing or sitting for "very long." (Tr. 41, 48, 49-50.) Plaintiff estimated he is able to stand "on the right knee without a significant

---

[13] Plaintiff refers in his brief to Dr. Davis's "September 2014" examination, see Pl's Br. at 5-6, but the Court understands Plaintiff's reference is to Dr. Davis's examination of Plaintiff in "September 2013." The September 2013 examination occurred prior to the administrative hearing and the ALJ's decision, both of which occurred before September 2014. Additionally, there is no record of an examination of Plaintiff by Dr. Davis in September 2014.

increase in the pain" a total of "45 minutes . . . out of a day." (Tr. 48-49.) In addition to taking Naproxen and Tramadol for pain, Plaintiff alleviates the knee pain temporarily by lying down and using a heating pad. (Tr. 41-42, 43, 52.) Plaintiff described his knee pain on a scale of one to ten as "get[ting] as high as a 10 sometimes." (Tr. 54.)

The medical records reveal that, in 2010, Plaintiff injured his right knee while unloading a truck at work and treated it with physical therapy before and after arthroscopic surgery performed by Dr. Brian Schafer in May 2010. (See, e.g., Tr. 417-32, 447-520, 548, 550, 552.) As of August 5, 2010, Plaintiff reported to Dr. Schafer that he had symptoms, especially with "deep flexion[,] but he has been back to full duty without restrictions." (Tr. 516.) On August 26, 2010, Dr. Schafer examined Plaintiff, and noted Plaintiff was at "full duty without restrictions" and reporting pain. (Tr. 557-59.) Plaintiff received an injection of Lidocaine and Celestone in his right knee, and was directed to return in three weeks for a Synvisc injection. (Id.) On October 7, 2010, Plaintiff reported "continued pain," was directed to undergo a functional capacity evaluation, and was permitted to return to work with no restrictions. (Tr. 534, 554-55.) As a result of a functional capacity evaluation on October 26, 2010, the evaluator, Chris Wheatley, MPT, recommended that Plaintiff "not perform repetitive knee bending activities; such as, squatting, kneeling or stooping due to increased [complaints of] right knee pain and crepitus." (Tr. 561.) Plaintiff continued to work until October 8, 2011, his date of disability onset.

On December 15, 2011, Chul Kim, MD provided an "internist examination" of Plaintiff for the Missouri Department of Elementary and Secondary Education Section of Disability Determinations. (Tr. 605-11.) During this examination, Plaintiff reported, with respect to his right knee, that he has pain all day long and it has gotten worse since the 2010 surgery, the knee

"swells . . . mostly in the evening," he "falls easily" without the cane, and he was told he developed arthritis in the knee. (Tr. 606.) Dr. Kim stated that Plaintiff's right knee has limited flexion with pain, and is "somewhat swollen" and tender. (Tr. 608.) Plaintiff's right hip also "had limited forward flexion to 65 degree[s] because of right knee pain." (Id.) Dr. Kim further reported that Plaintiff's:

> gait was slow with or without a cane. He was able to bear full weight on right leg and left leg for a few seconds, walking on heels and toes was unstable[,] . . . squatting was less than halfway because of right knee pain[,] and getting on and off the examining table was without significant problems.

(Id.) An x-ray of the right knee showed, "[m]ild to moderate degree of narrowed medial compartment of femorotibial joint space with degenerative joint disease." (Id.) As his impression of Plaintiff's right knee, Dr. Kim stated Plaintiff has "[c]hronic pain in the right knee, he underwent an arthroscopic surgery following an injury but developed osteoarthritis, [and] he uses a cane to prevent falls." (Id.)

During a December 21, 2011, appointment with his treating medical care provider to check his blood pressure, Plaintiff reported "he was been having a lot of right knee pain." (Tr. 363.) P.A. Weiss found "[t]enderness on palpation . . . and ambulation," pain "elicited by motion," and no instability or muscle weakness in the knees. (Tr. 364.) Plaintiff received a corticosteroid injection in his right knee and instructions to ice the knee, use an [A]ce bandage, elevate the leg, and take "[n]onsteroidal anti-inflammatories (Advil or Motrin, or Aleve if appropriate) for 5-7 days, with fluids." (Id.) P.A. Weiss also ordered right knee x-rays. (Id.) The x-rays that day resulted in the following assessment by Kenneth L. Rall, M.D.: "Knee joint normal. No fracture-dislocation or bone destructive changes. No ligamentous or cartilaginous calcifications." (Tr. 391.)

During six visits with P.A. Weiss in 2012, Plaintiff reported knee pain only twice, on February 9, 2012 and on June 8, 2012. (Id.,Tr. 624-34.) For the latter appointment, Plaintiff's "only complaint [wa]s of continued knee pain," and P.A. Weiss noted, "The knee pain has not changed and is stable." (Tr. 632-34.)

Plaintiff's next appointment addressing his knee was a visit with Dr. D.L. Davis on February 12, 2013, to establish care. (Tr. 640-42.) With respect to Plaintiff's right knee, Dr. Davis noted Plaintiff had previously had right knee surgery and observed that Plaintiff had a "[n]ormal gait." (Tr. 641.) While Dr. Davis noted, during a March 18, 2013, examination that Plaintiff "walks with a cane" (Tr. 682), for subsequent examinations of Plaintiff on April 11, 2013, May 16, 2013, and June 17, 2013, for care unrelated to his right knee, Dr. Davis reported Plaintiff had a "[n]ormal gait" (Tr. 671-72, 674-75, 679-80, 683). Dr. Davis did not report right knee complaints, symptoms, or pain during those three appointments, or during a June 20, 2013 appointment (Tr. 669); and reported "[n]egative" for his review of Plaintiff's musculoskeletal systems at those appointments.

On July 1, 2013, Plaintiff visited Dr. Davis and reported he was "still having some problems with his knees." (Tr. 666.) Dr. Davis noted "[s]ome crepitance of his right knee. Normal gait. No edema." (Tr. 666-67.) Dr. Davis decided to try "naproxen to see if this will help to use periodically." (Tr. 667.) Plaintiff did not mention right knee problems during a July 18, 2013, appointment with Dr. Davis to address sinus problems (Tr. 716).

On August 15, 2013, Dr. Davis saw Plaintiff, who said his "biggest issue . . . right now is again the issue with his right knee." (Tr. 713.) Plaintiff told Dr. Davis that he was "really having a lot of problems with his right knee. . . . It is getting almost intolerable. He has had steroid injections as well as Synvisc injections with minimal results." (Id.) Plaintiff mentioned

"[h]e was told he was 'too young' to consider a total knee arthroplasty." (Id.) Dr. Davis found Plaintiff had "[q]uite a bit of crepitance of his right knee with some effusion[; a n]ormal gait[; and d]egenerative joint disease." (Tr. 714.) Dr. Davis recommended an orthopedic consultation and the continuation of Plaintiff's medications. (Id.)

William Pelton, M.D., reviewed "three-view right knee" x-rays of Plaintiff taken on September 3, 2013. (Tr. 733.) Based on his review, Dr. Pelton found: "There is minimal medial compartment joint space loss seen at the right knee[,] likely degenerative [in] nature. There is a small suprapatellar density suggesting a small suprapatellar effusion. No definitive right knee acute fracture or dislocation is otherwise identified." (Id.) Dr. Pelton reported his impression that Plaintiff had: "1. Minimal medial compartment joint space loss suggestive of medial compartment minimal degenerative disease of the right knee [and] 2. Small suprapatellar effusion." (Id.)

After the x-rays, Plaintiff saw Thomas Graber, M.D., for his right knee pain on September 3, 2013. (Tr. 732.) Plaintiff told Dr. Graber the arthroscopic knee surgery:

> was of no benefit. He has had [a] Synvisc injection without benefit. He takes Tramadol for the discomfort. He has used Aleve and Motrin without significant relief. He wore [a] knee brace both before and after his surgery. He took physical therapy before and after his surgery. . . . He was told nothing will help him except a total knee replacement.

(Id.) Dr. Graber examined Plaintiff and found "full extension and flexion to 135 degrees. This motion is only with pain. Pain is present circumferentially. He has no ligamentous instability in any direction. There is no localized tenderness present." (Id.) Dr. Graber stated he was "uncertain as to the etiology of [Plaintiff's] problem . . . [and] he [did] not believe that total knee [replacement] is indicated in the presence of a normal x-ray and a normal knee to examination." (Id.) Noting that Plaintiff is unable to have an MRI due to the cochlear implant, Dr. Graber

recommended "repeat arthroscopic surgery. If [Plaintiff] has localized degenerative changes then he may possibly be a candidate for a unicompartmental knee replacement." (Id.)

Dr. Davis saw Plaintiff on September 30, 2013, for knee pain, among other complaints. (Tr. 736-37.) After examining Plaintiff, for "musculoskeletal/extremities," Dr. Davis reported "[s]ignificant for right knee pain and crepitance. Normal gait. No edema." (Tr. 737.) Dr. Davis assessed Plaintiff with degenerative joint disease and diabetes, referred Plaintiff for a sleep study, and noted Plaintiff would be seen again after the sleep study. (Id.) No subsequent medical records are available.

In addressing Plaintiff's right knee issues, the ALJ noted Plaintiff alleged "disability due to . . . arthritis in his right knee, and residual effects from right knee surgery. . . . He has asserted that his knee frequently 'locks up' and that it starts 'aching and hurting' after standing for 'periods of time.'" (Tr. 20.) The ALJ further noted Plaintiff "has alleged . . . that he cannot squat or bend, . . . can stand for only two minutes at a time and can only walk 20 feet before having to stop and rest." (Id.) With respect to the medical records regarding Plaintiff's right knee, the ALJ wrote:

> Treatment records show that [Plaintiff] often reported right knee pain when presenting for treatment. . . . A September 2013 diagnostic image of [Plaintiff]'s right knee revealed "minimal" compartment joint space loss, "minimal" degenerative joint disease, and "small" suprapatellar effusion. . . . The record indicates that [Plaintiff] underwent knee surgery around 2010. At one exam, [Plaintiff] reported that the surgery was "of no benefit." However, notwithstanding [Plaintiff]'s complaints and his assertion that his prior surgery was unhelpful, the record shows that findings upon physical examination have been relatively unremarkable, or, at the least, inconsistent with his allegations. For instance, at multiple examinations, [Plaintiff] did not report musculoskeletal symptoms or none were found on a review of systems. . . . During a March 2013 examination, it was noted that [Plaintiff] walked with a cane. . . . However, on several other occasions, [Plaintiff] exhibited a normal gait. . . . During a December 2011 examination, [Plaintiff] did not exhibit lower extremity weakness.

(Tr. 20.)   Based on the above-noted treatment of Plaintiff's right knee, the ALJ found the treatment was "inconsistent with allegations of disabling level knee issues."  (Id.)   Additionally, the ALJ noted that Plaintiff's contention only a total knee replacement would help his knee pain, was contrary to the results of the September 2013 examination by an orthopedic specialist who had found Plaintiff was not a candidate for such surgery in light of the normal diagnostic images of the right knee and normal knee examination.  (Id.)   The ALJ remarked that, "[t]he record shows that [Plaintiff]'s knee issues have otherwise been treated with only conservative treatment measures."  (Id.)

Plaintiff urges the ALJ did not consider his ongoing complaints of knee pain, but the ALJ expressly took Plaintiff's ongoing reports of knee pain into account to lower the work level that had been recommended by the State agency medical consultant from "full range of medium exertional level work" to "light exertional level work subject to various nonexertional limitations."  (Tr. 21, 22.)   While the ALJ acknowledged the ongoing reports of knee pain, the ALJ also properly considered the unremarkable medical findings regarding Plaintiff's right knee, as well as inconsistencies in Plaintiff's reports of knee pain and use of a cane[14] since the date of disability.  (Tr. 20, 21.)   Plaintiff also asserts the suggestion that he have unicompartmental knee replacement supports a conclusion the ALJ failed properly to develop the record.   That suggestion, however, was qualified by a recommendation that Plaintiff first have another arthroscopic surgery to ascertain whether such a knee replacement was warranted.   There is no indication that Plaintiff had that surgery by the time of the administrative hearing.   Finally, the ALJ expressly considered the September 2013 examinations and assessments, and Plaintiff's position that the 2010 knee surgery was "of no benefit."  (Tr. 20.)

---

[14]   Plaintiff also relies on his use of a knee brace to support his argument the ALJ should have more fully developed the record.   The record does not, however, demonstrate Plaintiff's use of a knee brace after the date of disability.

In summary, the record includes medical examinations, medical treatment, and medical opinions regarding Plaintiff's right knee pain from the 2010 date of knee injury up through approximately six weeks before the administrative hearing. The ALJ considered the comprehensive record regarding Plaintiff's right knee in assessing the knee's affect on Plaintiff's disability.[15] The available information shows the record regarding the crucial issue of Plaintiff's right knee pain was fully developed. See, e.g., Eichelberger, 390 F.3d at 592. "The mere fact that working may cause pain or discomfort does not mandate a finding of disability." Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000). Under the circumstances, there is no indication the ALJ needed additional medical evidence regarding Plaintiff's right knee pain to consider whether it was disabling.

## IV.    Conclusion

The Court finds substantial evidence in the record as a whole supports the Commissioner's decision that Plaintiff is not disabled. As discussed above, neither the ALJ's decision regarding the nonseverity of Plaintiff's bilateral carpal tunnel syndrome and diabetes, nor the available record regarding Plaintiff's bilateral carpal tunnel syndrome and right knee pain support reversal of the decision. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Acting Commissioner denying Social Security benefits to Plaintiff is **AFFIRMED**. A separate judgment in accordance with this Memorandum and Order is entered this date.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 2nd day of March, 2017.

---

[15] Although the ALJ rejected medical opinions regarding the disabling nature of the right knee injury issued during the care of the work injury, this is not a situation, as in Snead, where the ALJ rejects a medical opinion without reasonable basis or without additional medical information to support the rejection. Instead, here the ALJ properly reasoned that those opinions arose out of care before the October 8, 2011, date of disability relevant to this case, and ultimately resulted in allowing Plaintiff to engage in substantial gainful activity, without restriction or limitation, for approximately one year prior to the date of disability. Moreover, the ALJ properly considered the medical care of Plaintiff's right knee throughout the period after the October 8, 2011 date of disability.